UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
  :
UNITED STATES OF AMERICA,                 :
  :
                           Plaintiff,  :
  :                        23-CR-218 (VSB)
            - against -  :
  :                    **OPINION & ORDER**
  :
COLIN WILLIAMS,                 :
  :
                          Defendant.  :
  :
------------------------------------------------------------X

VERNON S. BRODERICK, United States District Judge:

        Before me is Defendant Collin Williams' Motion to Dismiss the Indictment on Second Amendment Grounds ("Motion"). (Doc. 19.) The Indictment alleges that Collin Williams ("Defendant" or "Williams"), "knowing he had previously been convicted in a court of a crime punishable by imprisonment for a term exceeding one year, knowingly possessed ammunition, to wit, two 9mm caliber Luger G.F.L. cartridge casings, and the ammunition was in and affecting commerce. (Title 18, United States Code, Sections 922(g)(1), 924(a)(8), and 2.)" (Doc. 6 ¶ 1.) Because under binding Second Circuit precedent § 922(g)(1) is a valid constitutional restriction on the Second Amendment rights of convicted felons and § 922(g)(1) is consistent with the historical tradition of firearms regulation in the United States, Defendant's Motion is DENIED.

      **I.**      **Background and Procedural History**

        According to the complaint filed in this action, on March 1, 2023, an individual identified as "Shooter-1"[1] confronted an individual identified as "Victim-1" outside a bodega located at

---

[1] Shooter-1 was subsequently identified by a New York State Parole Officer as Williams from a still image from the security camera video footage depicting the confrontation between Shooter-1 and Victim-1. (*See* Doc. 1 at ¶ 4(b).)

3399 Boston Road in the Bronx, New York.  (*See* Doc. 1.)  Williams stated to Victim-1, "[y]ou said I'm an informer, right?", (*id*. at ¶ 3(i)), and "[t]he fuck is you talking about?  Get gunned down.  Get gunned down.  Get gunned down.  Get gunned down this morning.  Get gunned down.  I promise you, get gunned down.  Get gunned down.  Get gunned down[,]" (*id*. at ¶ 3(k)).  Victim-1 lunged toward Williams, after which two gunshots rang out.  (*Id*. at ¶¶ 3(r), (l).)  Williams then walked southbound away from the scene, (*id*. at ¶ 3(m)), while three bystanders carried Victim-1 to a parked car in front of the bodega, and drove Victim-1 to a local hospital, (*id*. at ¶ 3(n)).

New York Police Department ("NYPD") officers who arrived at the scene shortly after the confrontation found two 9mm Luger caliber shell casings on the sidewalk in front of the Wilson Avenue side of the bodega.  (*Id*. at ¶ 3(c).)  An NYPD officer interviewed a doctor at the hospital to which Victim-1 was taken after the shooting.  (*Id*. at ¶ 3(u).)  This doctor informed the NYPD officer that Victim-1 was "shot at least one time in the abdomen and was suffering from limited sensation in his lower extremities."  (*Id*. at ¶ 3(u).)

The confrontation between Williams and Victim-1 was captured on video by security cameras located at the bodega and across the street.  (*Id*. at ¶ 3(d).)  On or about March 7, 2023, a New York State Parole Officer was shown a still image from the security camera video footage depicting "Shooter-1".  (*Id*. at ¶ 4(a).)  The Parole Officer identified the individual depicted in the still image as Williams.  (*Id*. at ¶ 4(b).)

On April 27, 2023, Williams was indicted on one count of possession of ammunition after a felony conviction, in violation of 18 U.S.C. § 922(g)(1).  (*See* Doc. 6 ¶ 1.)  Williams was previously convicted in Bronx County in 2015 for gang assault in the first degree under New

York Penal Law Section 120.07.  (Def.'s Mem. 1.)[2]  On September 22, 2023, Defendant filed this Motion, (Doc. 19), arguing that 18 U.S.C. § 922(g)(1) cannot constitutionally be applied to him under the current interpretation of the Second Amendment.  The Government filed a memorandum of law in opposition on October 5, 2023, (Doc. 20), and Williams filed a reply memorandum on October 13, 2023, (Doc. 21).  After reviewing the parties' submissions, on November 2, 2023, I heard oral argument on the Motion.

## II.  **Legal Standard**

The Second Amendment recognizes "an individual right to keep and bear arms for self-defense."  *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2125 (2022).  "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct."  *Id*. at 2129–30.  For a regulation of such conduct to pass constitutional muster, "[t]he government must . . . justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation."[3]  *Id*. at 2130.

The framework for assessing whether a regulation is "consistent with the Nation's historical tradition of firearm regulation" differs according to the nature of the problem the regulation is meant to solve.  *Id*. at 2130–32.  "For instance, when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment."  *Id*. at 2131.  However, "unprecedented societal concerns or dramatic technological changes may require a more nuanced approach."  *Id*. at 2132.

---

[2] "Def.'s Mem." refers to the Memorandum of Law in Support of Colin Williams' Motion to Dismiss.  (Doc. 19.)

[3] *Bruen* replaced the so-called means-end scrutiny of the regulation previously adopted by the Supreme Court.  *See N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022).

3

"When confronting such present-day firearm regulations, this historical inquiry that courts must conduct will often involve reasoning by analogy." *Id*. "[A]nalogical reasoning requires only that the government identify a well established and representative historical analogue, not a historical twin." *Id*. at 2133. In other words, "a modern day regulation" need not be "a dead ringer for historical precursors" to survive constitutional scrutiny. *Id*. Instead, the regulations must be "relevantly similar" in light of "at least two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id*. at 2132–33.

### III. Discussion

Williams argues that 18 U.S.C. § 922(g)(1) is unconstitutional facially and as applied to him. (Def.'s Mem. 2.) As an initial matter, he argues that rather than rely on *United States v. Bogle*, 717 F.3d 281 (2d Cir. 2013), I should address the merits of his argument, undertake the *Bruen* analysis, and put the Government to its historical burden. (*Id*. at 3–5.) Then, in contending that 18 U.S.C. § 922(g)(1) is unconstitutional on its face, Williams argues that the Second Amendment's plain text covers the conduct regulated by § 922(g)(1). (*Id*. at 5.) Specifically, he argues that the phrase "the people" in the Amendment's "operative clause," providing that "the right of the people to keep and bear Arms, shall not be infringed," includes those with prior felony convictions. (*Id*. at 5.) Given that "the plain text covers the alleged § 922(g)(1) offense conduct," he contends, "the burden shifts to the government to justify the statute by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." (*Id*. at 6.) Williams ultimately argues that the Government cannot carry its burden because "such prohibitions date only to the twentieth century and cannot establish a 'historical tradition' under [the] standard articulated in *Bruen*." (*Id*. at 7.) Specifically, he argues that "[i]n 1791, there was no longstanding tradition of imposing a lifelong firearms ban on someone found guilty of any felony." (*Id*. at 8.) Williams further contends that "[e]ven if § 922(g)(1) could be constitutionally applied in some cases,

4

the statute would remain unconstitutional on its face because, without historical support for a legislative power to categorically disarm felons *qua* felons, it is unconstitutionally overbroad." (*Id*. at 8.)  Finally, in the alternative, Williams argues that 18 U.S.C. § 922(g)(1) is unconstitutional as applied to him "because, in 1791, his prior felony conviction for gang assault—which in turn subjects him criminal liability under § 922(g)(1)—would not have resulted in a lifetime ban on possessing a firearm or ammunition." (*Id*. at 10.)

In response, the Government offers four arguments:  first, that *United States v. Bogle*, 717 F.3d 281 (2d Cir. 2013), *District of Columbia v. Heller*, 554 U.S. 570 (2008), and *McDonald v. City of Chicago*, 561 U.S. 742 (2010) all confirm the constitutionality of § 922(g)(1)'s prohibition on the possession of firearms by felons; second, that *Bruen* does not undermine § 922(g)(1) or *Bogle*; third, that text and history confirm that § 922(g)(1) is consistent with the Second Amendment; and fourth, that Williams falls within the historically excludable class. (Gov.'s Opp 3-27.)[4]

### A. *Binding Precedent Compels Denial of Williams' Motion.*

In the majority opinion in *Heller* by Justice Antonin Scalia, the Supreme Court held that "the Second Amendment confer[s] an individual right to keep and bear arms."  554 U.S. at 595.  However, the Court cautioned that "nothing in [its] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons." *Id*. at 626.  Similarly, in Justice Samuel Alito's principal opinion in *McDonald*, the Court repeated that caution.  *See* 561 U.S. at 786 ("We made it clear in *Heller* that our holding did not cast doubt on such longstanding regulatory measures as prohibitions on the possession of firearms by felons.") (internal quotation marks omitted).  Even if these statements might be considered dicta, they became binding on

---

[4] "Gov.'s Opp." refers to the Government's Opposition to Defendant Colin Williams' Motion to Dismiss. (Doc. 20.)

district court judges in this Circuit when the Second Circuit adopted them in *Bogle*. Specifically, in *Bogle*, the Second Circuit held that "§ 922(g)(1) is a constitutional restriction on the Second Amendment rights of convicted felons." 717 F.3d at 281–82. Other judges in this Circuit to consider this very issue have come to a similar conclusion. *See United States v. Mitchell*, No. 23-CR-198 (ALC), Doc. 31 (S.D.N.Y. Nov. 17, 2023) ("Defendant argues the Court's reassurances in *Heller* and *McDonald* are dicta. However, the Second Circuit in *Bogle* adopted the ''dicta' in *Heller* and *McDonald* [as] binding precedent.' *United States v. Hampton*, No. S2 21-CR-766 (JPC), 2023 WL 3934546, at *12 (S.D.N.Y. June 9, 2023). 'With *Heller* and *McDonald* still in full force after *Bruen*, *Bogle* remains binding precedent within this Circuit on the constitutionality of section 922(g)." *Id.* (citing *United States v. Garlick*, No. 22- CR-540 (VEC), 2023 WL 2575664, at *5 (S.D.N.Y. Mar. 20, 2023))); *see also United States v. Davila*, No. 23-CR-292 (JSR), 2023 WL 5361799 (S.D.N.Y. Aug. 22, 2023) at *2 (finding that "[b]inding precedent compels denial of [defendant's] motion"); *see also United States v. Ford,* 23-CR-107 (LSG), Doc. 43 (S.D.N.Y. Oct. 30, 2023) (same); *United States v. Warren*, 22-CR-231 (DLI), 2023 WL 5978029, at *5 (E.D.N.Y. Sept. 14, 2023) (same).

Williams argues that *Bogle* is "inapposite because it did not conduct the historical analysis that the Supreme Court first required nine years later in *Bruen*." (Def.'s Mem. 3.) I disagree. The Supreme Court stated in *Bruen* that "nothing in [its] analysis should be interpreted to suggest the unconstitutionality of . . . shall-issue licensing regimes," "which often require applicants to undergo a background check" and "are designed to ensure . . . that those bearing arms in the jurisdiction are, in fact, law-abiding, responsible citizens." 142 S. Ct. at 2138 n.9.[5]

---

[5] *Bruen* dealt principally with firearms, and here the offending item is ammunition. However, since neither party raises this difference as impacting the constitutional analysis, I do not address the issue.

6

### B. *Felons are "People"*

Although I could end my analysis based upon *Bogle* and dismiss Defendant's motion, I will address some of the other reasons given by the Government that I should deny the Motion. In particular, I do not accept the Government's assertion that felons are wholly excluded from "the people" as used in the Second Amendment. *See* U.S. Const. amend. II ("A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed.")  The Supreme Court has already held that "the people" protected by the Second Amendment—much like "the people" protected by the First, Fourth, Ninth, and Tenth Amendments—"refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community." *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990). Moreover, "the term unambiguously refers to all members of the political community, not an unspecified subset." *Heller*, 554 U.S. at 580. There is no basis for reading "the people" in the text of the Second Amendment to exclude felons.

### C. *Section 922(g)(1) is Consistent With the Nation's Historical Tradition of Firearms Regulation*

The Government has met its burden of demonstrating a historical tradition of firearms regulation that is sufficiently analogous to § 922(g)(1) to uphold the statute's legitimacy. *See United States v. Jackson*, 69 F.4th 495, 501-06 (8th Cir. 2023) (so holding in addressing a similar challenge to § 922(g)(1)). As the Government notes, "[b]y the time of the Second Amendment's ratification in 1791, there was a robust tradition of legislatures exercising broad 'discretion to disqualify categories of people from possessing firearms to address a threat purportedly posed by these people to an orderly society and compliance with its legal norms.'" (Def.'s Opp. 15–16, quoting *Jackson*, 69 F.4th at 503.)

During the colonial period, the American colonies inherited the English tradition of broad legislative authority to disarm classes of people who were viewed as untrustworthy or dangerous. *See* Saul Cornell, A Well-Regulated Militia: The Founding Fathers and the Origins of Gun Control in America, 28–29 (2006). "Laws disarming groups such as slaves, freed blacks, Indians, and those of mixed-race ancestry were common." *Id*. Colonial laws that disarmed Catholics were also common.[6] *United States v. Perez*, 6 F.4th 448, 462 (2d Cir. 2021) (Menashi, J., concurring in the judgment) (citing Virginia law); *see also* Joseph G.S. Greenlee, The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms, 20 Wyo. L. Rev. 249, 263 (2020) (citing Maryland, Virginia, and Pennsylvania laws). While these specific "categorical prohibitions of course would be impermissible today under other constitutional provisions, they are relevant here in determining the historical understanding of the right to keep and bear arms." *Jackson*, 69 F.4th at 503.

During the Revolutionary War, American legislatures passed numerous laws disarming individuals who failed to demonstrate loyalty to the emergent American government. *Jackson*, 69 F.4th at 503. The Government aptly summarizes many of these laws in its opposition brief. (*See* Def. Opp. 19–20.) These laws formed the backdrop for the ratification debates that shaped the Second Amendment and its ultimate adoption.

This country's history of felony punishment laws also demonstrates how "those convicted of felonies are not among those entitled to possess arms" under the Second Amendment. *Medina v. Whitaker*, 913 F.3d 152, 158, 160 (D.C. Cir. 2019). As Blackstone explained, a felony at common

---

[6] To be clear, the view that these groups were dangerous or untrustworthy was based on racism rather than facts and there is no question that it is abhorrent and contrary to American law and societal values today. However, I must nevertheless be faithful to *Bruen*'s framework, which is to assess whether historical firearms regulations are "relevantly similar" to those today. 142 S. Ct. at 2132. Here, I focus not on the race, national origin, religion or ethnicity of individuals but rather on individuals whose actions warrant objectively considering them to be violent and untrustworthy.

8

law was "an offence which occasions a total forfeiture of either lands, or goods, or both . . . and to which capital or other punishment may be superadded, according to the degree of guilt." 4 William Blackstone, Commentaries on the Laws of England, 95 (1769). The First Congress made numerous felonies punishable by death, including treason, piracy, robbery, counterfeiting, *see* An Act for the Punishment of Certain Crimes Against the United States, 1 Stat. 112, 112-15 (1790), forgery and horse theft, *Medina*, 913 F.3d at 158, and forfeiture of estate was a commonly authorized punishment in the American colonies (and then the states) up to the time of the founding, *see Folajtar v. Attorney General*, 980 F.3d 897, 904–05 (3d Cir. 2020). That the founders understood felons to be punishable by death and estate forfeiture demonstrates that they also understood that felons could be permissibly disarmed. (*See*, *e.g.*, *Medina*, 913 F.3d at 158 ("[I]t is difficult to conclude that the public, in 1791, would have understood someone facing death and estate forfeiture to be within the scope of those entitled to possess arms."))

This historical record therefore demonstrates that legislatures historically disqualified categories of persons from possessing firearms, just as felon-dispossession statutes do today. It also shows that their reasons for doing so could include a legislative judgment that the disarmed persons could not be trusted to be responsible, law-abiding members of the polity, just as felon-dispossession statutes do today.

I therefore find that the regulations the Government cites are sufficiently analogous to 18 U.S.C. § 922(g)(1) in accordance with the relevant criteria: "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Bruen*, 142 S. Ct. at 2132–33. The "how"—disqualifying categories of people from possessing firearms and ammunition—is identical. The "why"—certain groups were deemed untrustworthy or dangerous—is the apparent rationale for 18 U.S.C. § 922(g)(1) to remove guns and ammunition from the hands of those who have harmed society and breached its trust. Williams' facial and as-applied constitutional

9

challenge to 18 U.S.C. § 922(g)(1) therefore fails.

### IV. <u>Conclusion</u>

For the foregoing reasons, Williams' Motion is DENIED. The Clerk of Court is respectfully directed to terminate the pending motion at Doc. 19.

SO ORDERED.

Dated: December 1, 2023
      New York, New York

_____
Vernon S. Broderick
United States District Judge